OPINION
This is an appeal by defendant, Carol Finkes, from a judgment of the Franklin County Court of Common Pleas following a jury trial in which the jury returned verdicts finding defendant guilty of aggravated murder and tampering with evidence.
On July 25, 2000, an indictment was filed against defendant charging her with one court of aggravated murder in violation of R.C. 2903.01 and two counts of tampering with evidence in violation of R.C. 2921.12. Each of the three counts contained a firearm specification. The matter came on for trial on January 22, 2001.
Following presentation of the evidence, the jury returned verdicts finding defendant guilty of all charges in the indictment. The trial court sentenced defendant by entry filed February 15, 2001. On appeal, defendant advances the following seven assignments of error:
 [I.] Defendant-Appellant was denied her rights under state law as well as her right to due process of law and to a fair trial under U.S. Const. amend. V and XIV and Ohio Const. art. I, section 16 as a result of the misconduct and overreaching of the prosecuting attorneys during cross-examination when she testified in her own behalf and during closing arguments to the jury.
 [II.] The court of common pleas committed prejudicial error under state law and denied Defendant-Appellant her right to due process of law and to a fair trial under U.S. Const. amend. V and XIV and Ohio Const. art. I, section 16 as a result of erroneous evidentiary rulings made during the trial, its failure to instruct the jury to disregard testimony as to which it sustained objections, its failure to give the jury a limiting instruction on the use of other acts evidence, and its failure to admonish the prosecutor in the jury's presence when the prosecutor continued to flagrantly disregard the court's evidentiary rulings.
 [III.] The court of common pleas committed prejudicial error under state law and denied Defendant-Appellant her right to due process and a fair trial under U.S. Const. amend. V and XIV and Ohio Const. art. I, section 16 when it granted the prosecution's motion in limine and prohibited the defense from eliciting testimony regard a past specific instance of the deceased's threatening and violent conduct and further prohibited the defense from mentioning during closing argument the aggravated menacing charge lodged against the deceased by his own mother for the purpose of showing that the deceased was the aggressor and that Defendant-Appellant was legally justified in shooting him in self defense.
 [IV.] The court of common pleas committed structural error, or alternatively, plain error, and denied Defendant-Appellant her right to due process and a jury determination on legal excuse or justification for the killing of the victim under U.S. Const. amend. V, VI, and XIV and Ohio Const. art. I, §§ 5
and 16 when it gave the jury a defective preponderance of the evidence instruction that permitted the jurors to render a verdict on aggravated murder without first resolving the question of whether she had met her burden of proving self defense by a preponderance of the evidence.
 [V.] The judgment of conviction for aggravated murder and for the tampering with evidence counts is not supported by evidence sufficient to satisfy the requirements of due process under U.S. Const. amend. V
and XIV and Ohio Const. art. I, § 16, or, alternatively, is against the manifest weight of the evidence.
 [VI.] Defendant-Appellant was denied her right to the effective assistance of counsel guaranteed to her by U.S. Const. amend. VI and XIV and Ohio Const. art. I, § 10.
 [VII.] The sentence imposed by the court of common pleas, including the maximum consecutive prison terms for tampering with evidence, the order of restitution, and a fine, is not supported by the record and is contrary to law.
The facts as adduced at trial are as follows. Defendant married Hans Schlotterer in 1965. They divorced in February 1990, but have held themselves out as "common law" marriage partners since late 1990. Defendant was the owner of The Bait Store ("store"), a retail establishment located at 7588 Riverside Drive in Dublin, Ohio.
Defendant purchased the business from her father in 1984 and continued his practice of paying employees in cash. The business includes the sale of fishing and boating equipment, convenience store items, cigarettes, beer, wine and lottery tickets; the renting of trailers under license with U-Haul; the installation of trailer hitches; the issuance of fishing and hunting licenses; and the operation of a stocked fishing lake. Defendant also operates a motor vehicle transfer business.
The store has a two-bedroom apartment and an office on the second floor. Defendant's long-time friend, Glen Weingarner, lives in the apartment. Defendant became Weingarner's guardian after he suffered a stroke. Weingarner helps out in the store occasionally in exchange for living rent-free in the apartment. Defendant often stays in the apartment when Schlotterer is out of town during the week. Defendant also owns a home adjacent to the store and resides there with Schlotterer on the weekends. Schlotterer works at the store when he is home on weekends. Larry Jones has been employed full time at the store since August 1999.
In the fall of 1999, seventeen-year-old James Coyan, III ("Coyan") learned that his girlfriend was pregnant with his child. Soon thereafter, he began disobeying established rules at home and was often truant from school. Coyan and his mother, Donna Simms, argued extensively about Coyan's behavioral problems. After he stole a pair of earrings from her, Simms filed delinquency charges, including a charge of aggravated menacing, against him. As a result, Coyan appeared at a juvenile court hearing in January 2000. According to Simms, the court ordered Coyan to: (1) obtain full-time employment and provide the court with either a letter or a pay stub evidencing such; (2) work toward obtaining a GED; (3) attend drug and alcohol assessment; and (4) follow established rules at home. A second hearing was scheduled for May 1, 2000, at which time Coyan would be required to prove that he had complied with all four of the court's orders.
Simms testified that Coyan's behavior improved markedly after his January 2000 court appearance. He began working for defendant part time at the store in late February or early March 2000 and increased his hours to full time in April 2000. Simms further testified that Coyan told her that he was paid approximately $300 per week, usually on Monday.
Paul Martin, one of defendant's former employees, testified that sometime in March or April 2000, he sold Coyan a .9 mm handgun. According to Martin, Coyan said he was buying the gun to resell at a profit and that he had to keep the gun at the store because he was not allowed to have it at his home or his girlfriend's house. Several people, including Weingarner, former store employees Jason Mooney and James Smirr, Alan Harding, a frequent store customer, and Dave Finkes, defendant's son, testified that they saw Coyan with the gun at the store in April 2000. Both Jason Mooney and Dave Finkes testified that Coyan asked them not to tell defendant about the gun. Harding testified that when he asked Coyan why he had the gun, Coyan stated that he "expect[ed] trouble around [the store]." (Tr. 734.)
Weingarner testified that at some point in April 2000, Coyan asked him if he wanted to purchase the gun. When Weingarner expressed some interest, Coyan told him that he would leave the gun with him until he made up his mind. Weingarner agreed to keep the gun and told Coyan he would store it in an old boot he kept at the top of the stairway. Shortly thereafter, Weingarner told defendant that he might purchase a .9 mm handgun. According to Weingarner, defendant discouraged him from doing so, citing the fact that he already owned a .22 caliber pistol. Weingarner did not tell defendant that the gun was hidden inside his boot.
Defendant testified that she kept money in several places inside the store, including a filing cabinet in the "cool room." She also kept several bundles of money in the bottom drawer of a dresser in her upstairs bedroom. Each bundle contained $100, comprised of twenty $1's, ten $5's and three $10's. The bills were folded over and bundled together with rubber bands. Defendant also kept larger denomination bills, i.e. $50's and $20's, in checkbook boxes in the top drawer of the same dresser. Defendant estimated that at the beginning of April, there was somewhere between $12,000 and $16,000 in the dresser.
Defendant further testified that the store was burglarized on April 10, 2000. Cigarettes and lottery tickets were stolen, along with $4,000 in cash taken from the bottom drawer of the filing cabinet located in the "cool room." Approximately one week later, defendant noticed that "a lot of money" was missing from her bedroom dresser. (Tr. 904-905.) On Saturday, April 29, 2000, she counted the money in the bottom drawer. Of the estimated $12,000 to $16,000, only $4,600 remained. She suspected that Coyan had been stealing the money, as she trusted Jones, Weingarner and Schlotterer. She did not, however, inform either Jones or Weingarner of her suspicions.
Joseph Pence testified that on April 29, 2000, he stopped at the store to buy a soda. As he stood at the counter waiting to pay, he overheard defendant and Coyan engaged in a heated discussion. According to Pence, defendant seemed agitated, aggressive and angry. Although Pence did not know the subject of the discussion, he overheard defendant say to Coyan, "[y]ou're not going to get away with this. I'm not going to put up with this. If you think you're going to get away with this, you're dead wrong." (Tr. 616.) Coyan responded by saying "I'll call my lawyer." Id.
Defendant testified that on Sunday, April 30, 2000, she, Weingarner, Schlotterer and Coyan were working at the store. At some point, defendant heard someone go up the stairs to the apartment. She suspected it was Coyan because she could see both Schlotterer and Weingarner inside the store. After finishing with her customer, she went upstairs and discovered that $800 was missing from the bottom dresser drawer. She told Schlotterer that she suspected Coyan and was going to immediately talk to the police about the situation. She left the store a little after 2:00 p.m. and drove to the Dublin police station. The dispatcher on duty told her that none of the detectives worked on Sunday and that she did not know whether any uniformed officers were in the building. The dispatcher suggested that she come back the next day after 8:00 a.m.
Frustrated with the lack of response from the Dublin police, defendant called the Columbus Police Department. She eventually met with Officer Jeffrey Bansek. Defendant explained to Officer Bansek that she owned the store and had recently hired an employee named Jimmy Coyan, whom she suspected was stealing money from the store on a daily basis. According to Bansek, defendant estimated that Coyan had stolen approximately $6,000. Defendant told Bansek that earlier in the day she left Coyan working at the store by himself, and when she returned two hours later, she discovered that $800 was missing. Officer Bansek told her he could do nothing to help her with the situation, given that the store was not within the jurisdiction of the Columbus Police Department.
Defendant then drove to the Perry Township police station. She told Officer Tim Malone that she believed that Coyan had stolen $800 that day and thousands of dollars in the past few weeks. She asked Officer Malone to arrange for Officer Pickney, a Perry Township officer with whom defendant was acquainted, to come to the store before 5:00 p.m. that day and confront Coyan. Officer Malone told defendant to go back to the store and he would arrange to have Officer Pickney call her there. Defendant declined this offer, stating that she did not want someone to call the store because it might tip Coyan off to her suspicions. Officer Malone offered defendant three alternative suggestions: fire Coyan; set up a surveillance camera; or perform a citizen's arrest of Coyan. Defendant rejected all three suggestions.
Officer Malone then requested his own dispatcher to summon a Dublin officer to speak to defendant. Dublin Officer Rick Brorein responded to the dispatch. Defendant explained to Officer Brorein that she believed Coyan had just stolen $800 and that she suspected him of stealing $4,000 on April 10. Defendant told Officer Brorein that Coyan was currently at work in the store. Assuming that money stolen that day was either on Coyan's person or somewhere in the store, Officer Brorein twice offered to go to the store to confront Coyan and try to persuade him to confess. Defendant declined Officer Brorein's offer, explaining that she was concerned that Coyan would not have the money on him. She also stated that she wanted to catch Coyan in the act of stealing the money. Officer Brorein then suggested that the police install a surveillance camera in the store the following day. Defendant told Officer Brorein that Coyan was scheduled to appear at a court hearing the next day and that she had to provide either a letter or payroll check establishing Coyan's employment at the store. Officer Brorein told her that it would be a perfect time to install a surveillance camera because Coyan would not be at the store.
Defendant testified that when she returned to the store, Schlotterer told her that while she was away he heard footsteps upstairs but could not investigate because he was too busy assisting customers. Defendant recounted the money and discovered that another $1,100 was missing from the bottom dresser drawer. She also noticed that someone had tampered with one of the checkbook boxes in the top drawer.
On Monday, May 1, 2000, Jones arrived to open the store at 6:30 a.m. Coyan was waiting outside for him. Defendant and Schlotterer arrived at 6:50 a.m. Defendant, surprised to see Coyan, asked him why he was at work. Coyan told defendant that his court hearing had been postponed because he did not have the paperwork he was required to bring to the hearing. Defendant testified that she put Coyan to work doing outside chores. She did not want him working inside the store because she suspected him of stealing.
Over the course of the morning, defendant did some routine work around the store. Schlotterer was outside, cleaning up the backyard. At approximately 12:45 p.m., defendant sent Jones on an errand and told him to take Weingarner with him. Only Coyan was left inside to attend the store. Nicki Howell, Coyan's girlfriend, testified that she talked to Coyan on the telephone at approximately 12:45 p.m. and that she overheard defendant tell Coyan to hang up the telephone and wait on customers.
Defendant testified that shortly after Jones and Weingarner left, she went upstairs to the bathroom. A few moments later, she heard someone running up the stairs. She came out of the bathroom and observed Coyan walk into her bedroom. He sat on the edge of the bed facing the dresser, opened the bottom dresser drawer, and took several bundles of money. He then rummaged through the top drawer of the dresser. Because she suspected that Coyan had been stealing money throughout the month of April, she decided to confront him. She retrieved the loaded .22 caliber pistol Weingarner kept in the bathroom and hid it behind her back. She walked into the bedroom and asked Coyan what he was doing. He responded that he was not doing anything. She then asked him if he was stealing money. He denied stealing money and explained that he was getting change for the register. Defendant again accused him of stealing. This time, defendant responded that he was looking for his gun. According to defendant, he then stood up and started to pull a .9 mm pistol from his holster and took a couple of steps toward her. At this point, defendant was "petrified" and "terrified" because she believed Coyan was going to shoot her, as there was no way out of the room except through her. (Tr. 882.) She did not attempt to run from the room because she did not think she had enough time to get out before Coyan shot her. She pulled her gun from behind her back and fired a shot at him.
Defendant testified that after firing the shot, she just stood there, pointing the gun at Coyan. She thought she might have missed him because he did not move, other than to take a slight step backward. At this point, she noticed that Schlotterer was standing to her left; however, she was not aware of exactly when he had come into the room. She kept the gun pointed at Coyan because she still believed he was going to kill her. According to defendant, Coyan then turned and "sort of crumpled down on the bed and scooted up across it." (Tr. 883.) When he landed on the bed, his gun ended up near his left hand, partially out of the holster. Defendant handed her gun to Schlotterer and walked over to the side of the bed. She pulled Coyan's gun the rest of the way out of the holster and put it in his right hand because she wanted the "authorities * * * to know that he had it [in his hand] and he was going to use it on me." (Tr. 885, 886.)
Defendant further testified that she then called 911 on a portable telephone in the bedroom and reported a robbery in progress. Defendant admitted that, although the alleged robbery had already taken place, she acted as if it was ongoing because she was afraid that the police would not believe that she acted in self-defense. According to defendant, her fears were borne of the fact that she had had previous legal confrontations with Dublin city officials over zoning and property issues.
During the conversation with the 911 dispatcher, defendant dropped the telephone. When she picked it up, she did not hear anything. Assuming that the call had been disconnected, she attempted to dial 911 again. She was so nervous and shaky, however, that she could not dial the telephone properly. She went downstairs to make the call and to see if anyone had come into the store. She told Schlotterer to remain in the bedroom with the gun pointed at Coyan.
Defendant further testified that when she got downstairs, she saw two women customers in the store. She told them both to leave the building. She then ran back upstairs to make sure that Schlotterer was all right. From the doorway of the bedroom, she could see that Coyan was still lying across the bed. She was not certain whether Coyan was alive or dead. She ran back downstairs and called 911 on the same portable telephone she had previously dropped. She told the dispatcher that she was at the store and that someone had come upstairs into the apartment, and she shot him. A few moments later, she walked out the front door and saw a police officer with a gun drawn. He motioned to defendant to come toward him; she motioned for the officer to come inside the store. When she realized the officer was not going to come inside, she went upstairs and told Schlotterer to come downstairs. She then disconnected the 911 call, and she and Schlotterer came downstairs. She took the gun from Schlotterer and put in on the bottom shelf of one of the showcases in the store. She covered the gun with bags and then she and Schlotterer walked outside together. She told the officer that she had just shot Coyan.
Dublin 911 police dispatcher Kathleen Evans testified that she received the 911 call from defendant at approximately 12:55 p.m. on May 1, 2000. According to Evans, defendant indicated that there was a robbery in progress at the store. Evans overheard defendant say "Jimmy, Jimmy stand still" and "Dammit, put the gun down." Defendant told Evans that "[h]e's got a gun." (Tr. 73.) According to Evans, the first call lasted about thirty seconds. Defendant hung up, but called back approximately two and one-half minutes later, at 12:58 p.m. In response to Evans's request for more details about the situation, defendant stated that the man was upstairs and identified him as an employee who had been working at the store for a few weeks. She further stated that "He got his gun out and so I shot him with mine." (Tr. 73.) Defendant told Evans that she thought the man was injured. When asked if she was injured, defendant stated "No, I'm not injured. I shot before he did injure me." Defendant also told Evans that she was now downstairs in the store. (Tr. 75.) Evans told her to go outside and speak to the police. She overheard defendant say "[m]ake sure it's unlocked." (Tr. 76.)
Dublin Police Officer Jeff Hall testified that he was the first officer to arrive on the scene. While waiting for additional units to arrive, Officer Hall observed defendant talking on the telephone inside the store near the front door. While still talking on the telephone, defendant exited the store and walked four or five feet outside. Concerned for defendant's safety, Officer Hall both signaled and shouted to her to come over to him. Defendant looked at Officer Hall, continued to talk on the telephone, turned around and walked back into the store. Officer Hall was somewhat surprised by defendant's willingness to re-enter the store, given that the information provided him was that there was a robbery in progress.
After a short delay, defendant and Schlotterer exited the store and walked over to Officer Hall. Defendant informed Officer Hall that she had shot a man named Jimmy on the second floor of the building because he had a gun and was trying "to get [her] money." (Tr. 111, 133.) As he was unfamiliar with the building, Officer Hall asked defendant where the stairway to the second floor was located. Instead of giving directions, defendant and Schlotterer led Officer Hall inside the store and to the stairway. Officer Hall thought defendant's willingness to return to the scene was "odd." (Tr. 112.) Specifically, Officer Hall stated that, "I thought it was pretty brave she was just going to waltz back into the situation. I was scared and I got body armor and a gun and everything else. And she was like I was on a tour or something." (Tr. 112.) Both defendant and Schlotterer started up the stairway after the officers. Officer Hall ordered them to stay downstairs.
According to Officer Hall, two yellow boxes of .380 caliber ammunition were stacked on the stairs. He went upstairs and could see a man stretched across the bed at the far end of one of the bedrooms. A .9 mm semi-automatic pistol was in Coyan's right hand (which was positioned above his head) and an empty holster lay tucked under his left leg. Officer Hall knocked both the pistol and the holster to the floor. Assuming Coyan to be dead, Officer Hall rolled him over, observed a gunshot wound in the center of his chest, and radioed for medical assistance. After medics removed the body from the scene, Officer Hall discovered a .22 caliber spent shell casing on a rug in the center of the room and several loose bills lying on top of a dresser.
Defendant was thereafter transported to the police station, where she was interviewed by two Dublin police officers. Defendant testified that she initially lied to the police about the shooting. Specifically, she told the officers that the robbery was in progress at the time she made the first 911 call; that Coyan had taken the gun completely out of the holster and pointed it at her before she shot him; and that she had tried unsuccessfully to take the gun out of Coyan's hand after he was lying on the bed. About midway through the interview, she decided to tell the truth. She admitted that she did not make the first 911 call until after she shot Coyan; that Coyan had never taken the gun completely out of the holster and had never pointed it at her; and that after she shot Coyan, she took the gun the rest of the way out of the holster and placed it in his hand.
Processing of the crime scene revealed four separate packs of folded paper money bundled together by rubber bands sitting on top of the dresser. Each bundle contained $100 in folded $10's, $5's and $1's. Twenty-three bundles of similarly denominated and folded bills totaling $2,294 were found in the bottom drawer of the dresser. A banded bundle of folded money totaling $450 and two loose $1 bills were found in the right front pocket of Coyan's jeans, which had been left in the bedroom by the medics.
A .22 caliber pistol with eight cartridges in the magazine and one in the firing chamber was found under the counter on the first floor of the store. The .22 casing found in the bedroom had been fired from the .22 caliber pistol found under the counter.
The .9 mm pistol found on the floor of the bedroom had a round in the chamber. An additional five rounds were in the magazine. The hammer was down and the safety lock was on. A fingerprint found on the .9 mm could not be matched to Coyan, defendant, Schlotterer or Weingarner. Although no fingerprints were found on the magazine, Coyan's fingerprint was found on one of the rounds in the magazine. One of Coyan's fingerprints was also found on a styrofoam insert from one of the two boxes of .380 ammunition found on the stairway. From the lack of gunshot residue found surrounding the hole in Coyan's shirt, it was determined that the muzzle-to-target distance was greater than four feet.
At trial, defendant testified that Coyan asked her to write him a letter evidencing that he worked at the store full time so that he could take it with him to the May 1, 2000 court hearing. Defendant testified that she did not write the letter because she did not consider Coyan a full-time employee and did not want to document something that was not true. Defendant further testified that she had never seen the gun Coyan pulled on her prior to the shooting. She also testified that although she knew Coyan owned a gun, she did not know that Coyan had been carrying it around the store. She further attested that she had never seen the boxes of ammunition on the stairway and was not aware of the magazine and ammunition in Weingarner's boot until Weingarner showed it to her sometime in December 2000. Defendant admitted that she shot Coyan intentionally, but that it was out of fear for her life because when she accused him of stealing, he pulled a gun on her with what she believed was an intent to kill her.
By the first assignment of error, defendant contends that she was denied her right to due process and a fair trial under both the United States and Ohio Constitutions as a result of misconduct and overreaching by the prosecution during cross-examination of defendant and closing arguments to the jury.
"The test for prosecutorial misconduct is whether [the prosecutor's conduct was] improper and, if so, whether [the conduct] prejudicially affected substantial rights of the accused." State v. Lott (1990),51 Ohio St.3d 160, 165. The ultimate issue is whether the defendant was deprived of a fair trial. State v. Apanovitch (1987), 33 Ohio St.3d 19,24. Alleged prosecutorial misconduct must be evaluated within the context of the entire trial. State v. Keenan (1993), 66 Ohio St.3d 402,410.
The scope of cross-examination rests within the sound discretion of the trial court. State v. Ferguson (1983), 5 Ohio St.3d 160, 165-166. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Berk v. Matthews (1990), 53 Ohio St.3d 161, 169.
Statements made by the prosecution during opening statements and closing arguments are not evidence. State v. Frazier (1995),73 Ohio St.3d 323, 338. Further, the prosecution is entitled to significant latitude in its closing remarks. Id. In general, the prosecution may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." Lott, supra. Moreover, the prosecution may state that the evidence supports the conclusion that the defendant is not telling the truth, is scheming, or has ulterior motives for not telling the truth. State v. Draughn (1992),76 Ohio App.3d 664, 670.
In determining whether the prosecution's remarks are improper and whether they prejudicially affected substantial rights of the defendant, an appellate court must consider several factors: (1) the nature of the remarks; (2) whether an objection was lodged by defendant's counsel; (3) whether corrective instructions were given by the court; and (4) the strength of the evidence against the defendant. State v. Calvin (2000), Marion App. No. 9-2000-07, unreported, citing State v. Braxton (1995),102 Ohio App.3d 28, 41.
Defendant first complains about the prosecution's cross-examination questions into her "alleged tax law violations." (Defendant-appellant's brief at 19.) As part of the prosecution's case-in-chief, Jones and Martin both testified that defendant always paid them in cash. Defendant lodged no objection to this testimony. On cross-examination, the prosecution asked defendant whether she paid her employees in cash, and if so, whether she paid applicable employment taxes. Defendant admitted that she paid her employees in cash but did not pay applicable taxes on their wages. Defendant attempted to explain her actions by inferring that she did not have to report her employees' wages because they did not earn enough money to warrant doing so.
Defendant argues that the prosecution's line of questioning was improper under Evid.R. 404(B), which allows the admission of evidence of other crimes, wrongs, or acts when offered for a limited purpose, such as to establish proof of motive to commit the charged crime. Specifically, defendant contends that the prosecution's questions were an attempt to use "other acts" evidence, i.e., defendant's alleged tax law violations, to supply a motive for defendant to murder Coyan. Defendant contends that the prosecution could not use such "other acts" evidence to supply a motive for the crime because the prosecution did not adduce "substantial evidence," i.e., tax returns, financial records, accountant testimony or an independent audit, sufficient to establish that defendant had violated tax laws.
Although we agree with defendant that the prosecution's theory of the case was that defendant was cheating on her taxes, that Coyan threatened to expose defendant's actions, and that defendant lured Coyan to the store's upstairs bedroom on May 1, 2000, in a calculated effort to silence him, we conclude, upon review of the entire record, that the prosecution questioned defendant about her alleged tax violations under Evid.R. 608(B) and 611(B), rather than Evid.R. 404(B). Under Evid.R. 608(B), an examiner may inquire about specific instances of misconduct if relevant to credibility. State v. Jurek (1989), 55 Ohio App.3d 70, 73. It is sufficient that the examiner has a good-faith belief that a factual predicate for the inquiry exists. State v. Gillard (1988),40 Ohio St.3d 226, paragraph one of the syllabus. Further, Evid.R. 608(B) provides, in relevant part, that: "[s]pecific instances of the conduct of a witness [may] * * * in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness * * *."
The testimony of Jones and Martin that defendant paid them in cash provided a good-faith basis for the prosecution's cross-examination inquiry into defendant's payment of applicable employment taxes. As noted previously, defendant admitted that she did not pay applicable employment taxes. Failing to report income or to pay taxes for employees is evidence of dishonesty. State v. Coleman (July 31, 1992), Delaware App. No. 91-CA-34, unreported. Accordingly, questions regarding defendant's alleged tax violations were clearly probative of her credibility.
Our finding that the prosecution's inquiry into defendant's alleged tax violation was made under Evid.R. 608(B) and 611(B), rather than Evid.R. 404(B), is further bolstered by the prosecution's comments in closing argument. The prosecution clearly argued that defendant's practice of failing to withhold applicable taxes on her employees' wages was evidence of her untruthfulness. As noted previously, the prosecution may aver that the evidence supports the conclusion that the defendant is not telling the truth, is scheming, or has ulterior motives for not telling the truth. Draughn, supra.
Similarly, we find that the prosecution's questions regarding defendant describing herself as an "unmarried woman" in several mortgage applications were also proper under Evid.R. 608(B) and 611(B). The prosecution asked defendant whether there was some monetary benefit in not putting Schlotterer's name on the mortgage applications. Defendant answered in the negative. Other testimony established that defendant was regularly making her mortgage payments. Defendant contends that the prosecution "offered no good faith basis for [the prosecution] to believe that any lender was being defrauded * * *." (Defendant-appellant's brief at 27.)
Upon review of the record, we cannot agree with defendant's contention that the prosecution's questions were aimed at establishing that defendant was defrauding financial lenders. To the contrary, we conclude that, like the questions regarding the alleged tax violations, the prosecution was attempting to establish defendant's lack of credibility. Further, a party is not required to offer evidence of a good-faith basis for cross-examination questions unless the opposing party questions whether a good-faith basis exists. In Gillard, supra, the court stated "[s]ince the prosecutor's good-faith basis for asking these questions was never challenged, we presume she had one. * * *" Id. at 231. In the instant case, the prosecution had a good-faith basis for inquiring as to why defendant described herself as an "unmarried woman" on mortgage applications when defendant testified that she was married. As with the allegations of tax fraud, the prosecution, in closing argument, used defendant's conflicting statements regarding her marital status as further evidence of defendant's lack of truthfulness.
Defendant next complains of a prosecution question with regard to defendant's automobile transfer business, which operates under the name "Glenco." The prosecution asked defendant how she, and not Weingarner's children, wound up with the business after Weingarner's stroke. Defendant replied that she, and not Weingarner, had always owned the business. The prosecution then asked whether she had documentation substantiating her claim of ownership. Defendant responded affirmatively. Defendant contends that these questions impermissibly suggested that defendant had cheated Weingarner out of his interest in the business. Specifically, defendant contends that the questions were improper under Evid.R. 607(B), which provides that: "[a] questioner must have a reasonable basis for asking any question pertaining to impeachment that implies the evidence of an impeaching fact." While it appears that the prosecution had no factual basis for asking defendant the challenged questions, we fail to see how defendant was prejudiced more than minimally by the questions, given that she definitively answered that she could support her claim with documentation.
Defendant next argues that the prosecution repeatedly asked defendant "unfair and misleading questions." (Defendant-appellant's brief at 29.) Defendant contends that the prosecution posed questions suggesting that defendant was less than truthful because "certain matters" testified to by defendant on direct examination were not discussed during defendant's interview with the police and/or her appearance before the Grand Jury. Initially, we note that defendant specifically argues only one of the "matters" she alludes to in any detail. As to the other "matters" alluded to, defendant merely cites transcript page numbers with no attendant argument. Further, without any citation to case law or the Rules of Evidence, defendant suggests that the prosecution's cross-examination of her should have been limited only to those areas about which the police specifically questioned her and/or about which the defendant testified at the Grand Jury proceedings. As noted previously, Evid.R. 611(B) permits cross-examination on "all relevant matters and matters affecting credibility." The prosecution was entitled to question and/or comment upon omissions from defendant's police statement and/or her Grand Jury testimony, as such was relevant to her credibility.
Defendant next contends that the prosecution engaged in misconduct by commenting during closing argument on the fact that Schlotterer did not testify in support of defendant's case. In particular, the prosecution argued in the opening portion of closing argument that:
 Hans Schlotterer, sort of an enigma in this case. * * * [T]hey are on good terms. They still consider themselves husband and wife. * * *
 Mr. Schlotterer unlike all of these witnesses the defense did call was, according to Carol Finkes, the only living person in the Bait Shop other than her at the time that Jimmy Coyan was killed.
 * * * [H]e is now presumably in her corner. Why did the defense not call him to support her self-defense claim?
* * *
 So why is it there's one witness that can support Carol Finkes in herself defense [sic] claim as has been implied here by Carol Finkes in her testimony, why, why, why, did they not call him to give that support? You decide. [Tr. 1156-1157.]
In the rebuttal portion of closing argument, the prosecution similarly commented:
 We know she planted the gun. Why wouldn't she plant the money and plant the body? And why isn't Hans here to tell us about that * * *?
* * *
 [Defendant] has the burden to prove self-defense. * * * And it is fair to ask where is Hans. [Tr. 1230.]
Initially, we note that defendant failed to object to the prosecution's comments regarding Schlotterer's failure to testify.[1] In the absence of an objection, we may consider only whether the comments made by the prosecutor constituted plain error. State v. D'Ambrosio (1993),67 Ohio St.3d 185, 192. For such commentary to rise to the level of plain error under Crim.R. 52(B), it must appear on the face of the record not only that error was committed but that, except for the error, the result of the trial clearly would have been different. State v. Underwood (1983), 3 Ohio St.3d 12, 14. The plain error rule must be applied with utmost caution and invoked only to avoid a clear miscarriage of justice. State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.
Notwithstanding defendant's failure to preserve the issue for appeal, we conclude that the prosecution's comments did not constitute prosecutorial misconduct. The prosecution is not prevented from commenting upon the failure of the defense to offer evidence in support of its case. State v. Williams (1986), 23 Ohio St.3d 16, 20. Thus, comments that a witness other than the accused did not testify are not improper. State v. Clemons (1998), 82 Ohio St.3d 438, 452. See, also, State v. Grissom (Oct. 27, 1995), Lucas App. No. L-94-220, unreported. As such, we do find the aforementioned comments to be inappropriate.
Moreover, we find defendant's reliance on both United States v. Blakemore (1973), 489 F.2d 193, and State v. Stiltner (Nov. 3, 1983), Franklin App. No. 83AP-360, unreported, to be misplaced. In Blakemore, the prosecution specifically stated that "the fact that [the witnesses] were not called would permit you to draw an inference that the testimony of those four individuals was unfavorable to the defendant and that's the reason they were not called." Id. at 195. In Stiltner, the uncalled witness was a prosecution witness that the prosecution refused to call. The prosecution gave his personal opinion of the uncalled witness's credibility and inferred that the defendant did not call her as a witness because the witness would have been unfavorable. In contrast, the prosecution in the instant case did not expressly tell the jury that it could reasonably infer from Schlotterer's failure to testify that Schlotterer's testimony would have been unfavorable to defendant.
Defendant next contends that the prosecution improperly questioned her about her substantial financial assets. Defendant argues that because her financial condition had nothing to do with the shooting of Coyan, the prosecution's line of questioning constituted an improper appeal to "class prejudice." Upon review of the record, we cannot agree. As noted previously, the state's theory of the case was that defendant killed Coyan in order to keep him from divulging defendant's alleged illegal business practices. Accordingly, the prosecution's probe into defendant's financial position was relevant to establishing that defendant had much to lose if Coyan were to disclose defendant's alleged illegal business practices.
In sum, we reiterate that in order to establish prosecutorial misconduct, defendant was required to demonstrate that the prosecution's conduct was improper, and that such conduct substantially affected her rights. Upon review of the record, we conclude that defendant has failed to demonstrate plain error resulting from any question or argument to which she failed to object and has failed to demonstrate improper conduct from any question or argument to which she objected. Even assuming that the prosecution's conduct was improper, we find no resulting prejudice therefrom, given defendant's own testimony that she falsely claimed during her first 911 call that Coyan was in the process of robbing her; that she placed the gun in Coyan's hand after she shot him; and that she initially lied to the police about these crucial facts. Accordingly, the first assignment of error is overruled.
By the second assignment of error, defendant contends that the trial court erred in overruling objections to the prosecution's improper questions and arguments raised in her first assignment of error. It is axiomatic that the admission or exclusion of evidence lies within the trial court's sound discretion. Rocky River v. Saleh (2000),139 Ohio App.3d 313, 324. Given our determination that the prosecution's questions and arguments were not improper, we find no abuse of discretion in the trial court's decision to overrule defendant's objections.
Defendant further contends that the trial court erred in failing to admonish the prosecution in the jury's presence with regard to the prosecution's method of posing cross-examination questions comparing defendant's testimony to the testimony of other witnesses. A review of the record reveals that the trial court admonished the prosecution, out of the jury's presence, that the questions posed to defendant could not be prefaced by statements such as "yesterday Ms. Jones testified." (Tr. 1027.) When the prosecution inquired as to whether a question could be prefaced by a statement such as "isn't it true that Larry Jones said," the trial court responded: "Absolutely you cannot ask that question. That is an improper question. * * * I don't want her to say what * * * Jones testified to. It's up to the jury to decide what * * * Jones testified to yesterday." Id. The court continued: "If you're trying to find out what time she went upstairs, [ask] what time did you go upstairs, not `* * * Jones testified yesterday that Jimmy made three hundred dollars, do you remember that. * * * How much did Jimmy make,' ask that question. Don't make the statement that mom's testified to that. It's not her job to decide what she heard in the courtroom." (Tr. 1027-1028.)
Defendant raises four specific instances where the prosecution engaged in the same form of improper questioning after being admonished by the trial court. Defendant lodged objections in all four instances, and the court sustained the objections. The trial court had previously instructed the jury to disregard questions to which the court sustained objections. Further, defense counsel did not request that the trial court admonish the prosecution in the presence of the jury.
Evid.R. 611(A) recognizes the trial court's authority to exercise control over the courtroom.[2] Judges have broad discretion in the manner by which they control the courtroom, and those decisions will not be reversed absent an abuse of that discretion. Id. After carefully reviewing the transcript, we cannot find that the trial court abused its discretion in failing to reprimand the prosecution in the jury's presence. Accordingly, the second assignment of error is overruled.
By the third assignment of error, defendant contends that the trial court committed prejudicial error under state law and denied defendant her right to due process and a fair trial under both the United States and Ohio Constitutions by granting the prosecution's motion in limine prohibiting defendant from eliciting testimony regarding past specific instances of Coyan's threatening and violent conduct.
Defense witness, Marty Soungpradith, testified that he rented a U-Haul truck from the store on April 14, 2000, and that Coyan assisted him with the transaction. When Soungpradith complained to Coyan about problems with the truck's gas gauge, the two began to argue. Coyan opened his jacket and revealed to Soungpradith that he was carrying a gun. The prosecution moved the trial court in limine to exclude further testimony regarding an alleged oral threat made by Coyan to Soungpradith ("Don't fuck with me" [Tr. 774]) on the ground that defendant did not have prior knowledge of the incident. Defense counsel argued that the statement should be included because it demonstrated the reason Coyan showed Soungpradith the gun. The trial court excluded the alleged oral threat. Defendant contends that the trial court erred in doing so.
Defendant also complains that the trial court improperly prohibited defense counsel from discussing in closing argument the aggravated menacing charge filed against Coyan by his mother.
The syllabus of State v. Barnes (2002), 94 Ohio St.3d 21, a case decided by the Supreme Court of Ohio after oral argument in this matter, states that: "A defendant asserting self-defense cannot introduce specific instances of a victim's conduct to prove that the victim was the initial aggressor." Applying Barnes, we cannot find that the trial court's decision to exclude Coyan's alleged threatening statement or reference to the aggravated menacing charge was improper. Accordingly, the third assignment of error is overruled.
By her fourth assignment of error, defendant contends that the trial court erroneously instructed the jury regarding her burden of proving self-defense. The court charged the jury on this issue as follows:
 * * * The burden of proving self-defense is on the defendant to prove by a preponderance of the evidence. And preponderance of the evidence is the greater weight of the evidence; that is evidence that you believe because it outweighs or overbalances in your mind the evidence opposed to it.
 A preponderance of the evidence means evidence that's more probable, more persuasive or of greater probative value. It's the quality of the evidence that must be weighed and quality may or may not be identical to the greater number of witnesses that have been presented.
 In determining whether an issue has been proved by a preponderance of the evidence, you should consider all the evidence regardless of who produced it. If the weight of the evidence is equally balanced in your mind or if you are unable to determine which side of the issue has the preponderance, then the defendant has not established such issue or such affirmative defense. [Tr. 1266.]
Defendant takes issue only with the phrase "if you are unable to determine which side of the issue has the preponderance." Defendant contends that such language permitted the jury the option of bypassing defendant's self-defense claim without resolving the question of whether the elements of self-defense had been established by a preponderance of the evidence.
The challenged language is taken directly from the pattern instruction defining preponderance of the evidence as applied to affirmative defenses under R.C. 2901.05(A) set forth in 4 Ohio Jury Instructions (2001), Section 409.60, paragraph 5, at 66. This court, in State v. West (Aug. 25, 1977), Franklin App. No. 77AP-290, unreported, approved a jury instruction with regard to the burden of proving an affirmative defense identical to that given in the instant case. Defendant has cited no relevant case law establishing that such an instruction is improper.
Further, we find that the jury instruction as a whole was sufficiently clear to enable the jury to understand defendant's burden of proof on the issue of self-defense. "In considering the appropriateness of a jury instruction, a reviewing court must view the instruction as a whole. The trial court does not commit reversible error if the instructions are sufficiently clear to enable the jury to understand the law as applied to the facts." Atkinson v. Internatl. Technegroup, Inc. (1995),106 Ohio App.3d 349, 365.
Moreover, assuming, arguendo, that the challenged phrase was improper, defendant waived the error by failing to object.[3] Defendant contends that this court should consider the alleged error as plain error.[4]
However, paragraphs two and three of the syllabus of Long, supra, provide, as follows:
 2. A jury instruction violative of R.C. 2901.05(A) does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise.
 3. Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.
We are convinced that, even if an instruction deleting the challenged phrase would have been given, the outcome of the trial would not have been otherwise. Therefore, we conclude that the instruction, even if erroneous, was harmless beyond a reasonable doubt.[5] The fourth assignment of error is overruled.
By the fifth assignment of error, defendant challenges both the sufficiency and manifest weight of the evidence supporting her convictions for aggravated murder and tampering with evidence.
In State v. Martin (Apr. 19, 2001), Franklin App. No. 00AP-836, unreported, this court noted that separate standards of review are to be utilized in sufficiency and weight of the evidence challenges:
 * * * In determining the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." * * * However, "[u]nlike a challenge to the sufficiency of the evidence, which attacks the adequacy of the evidence presented, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented." * * * When reviewing the manifest weight of the evidence, an appellate court sits as a thirteenth juror; the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of all witnesses and determines whether, in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. * * * Further, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. * * *" [Citations omitted.]
As relevant to the instant case, aggravated murder is defined in R.C.2903.01(A), as follows: "No person shall purposely, and with prior calculation and design, cause the death of another * * *." Defendant does not contest the fact that she purposely caused Coyan's death. She contends only that the prosecution failed to prove beyond a reasonable doubt the element of "prior calculation and design." Specifically, defendant contends that the state's theory that defendant developed a premeditated plan to kill Coyan in order to prevent him from revealing to the juvenile court that defendant paid her employees in cash required the impermissible stacking of inferences. We disagree.
An element of the charged offense may be established by direct evidence, circumstantial evidence, or both. State v. Durr (1991),58 Ohio St.3d 86. Circumstantial and direct evidence are of equal evidentiary value. State v. Jenks (1991), 61 Ohio St.3d 259, 272
(circumstantial evidence and direct evidence inherently possesses the same probative value and in some instances certain facts can only be established by circumstantial evidence).
In State v. Ebright (1983), 11 Ohio App.3d 97, this court explained the rule against drawing an inference from another inference:
 "An inference based solely and entirely upon another inference, unsupported by any additional fact or another inference from other facts, is an inference on an inference and may not be indulged in by a jury.
 "An inference which is based in part upon another inference and in part upon facts is a parallel inference and, if reasonable, may be indulged in by a jury." Hurt v. Charles J. Rogers Transportation Co. (1955), 164 Ohio St. 329 * * * paragraphs one and two of the syllabus.
 "The only inferences of fact which the law recognizes are immediate inferences from facts proved, but a given state of facts may give rise to two or more inferences, and in such case one inference is not built upon another but each is drawn separately from the same facts." McDougall v. Glenn Cartage Co. (1959), 169 Ohio St. 522, 160 N.E.2d 266 [9 O.O.2d 12], paragraph two of the syllabus
 The principle underlying the rule is that, where an inference is based solely and entirely upon another inference, its foundation is so insecure that reliance upon the second inference would stretch credulity beyond its permissible bounds and result in an inferred fact which in reality is speculative, raising merely a conjecture or possibility. [Id. at 99.]
In the instant case, no inference the prosecution asked the jury to draw is based "solely and entirely" upon a single, other inference. Rather, both direct and circumstantial evidence, and reasonable inferences that can be drawn therefrom, combine to establish the prior calculation and design element.
Defendant testified that she paid her employees in cash and did not pay applicable employment taxes. As noted previously, defendant attempted to explain this practice by suggesting that she did not have to report her employees' wages because they did not earn enough to warrant reporting their income. However, the jury was not required to believe defendant's explanation and reasonably could have inferred that she believed that by paying her employees in cash and not paying attendant employment taxes, she was violating tax laws.
Coyan's mother testified that Coyan worked at the store full time and earned approximately $300 per week. Coyan's mother also testified that Coyan was required to provide evidence to the juvenile court on May 1, 2000, that he had a full-time job. Defendant testified that Coyan requested that she write a letter to the court explaining that he was working full time for defendant. Defendant testified that she did not write the letter because she did not want to falsely state that Coyan was a full-time employee. However, the jury was not required to believe defendant's explanation and could have inferred from the fact that she did not write the letter that she was afraid written documentation of a full-time employee could incriminate her with regard to her failure to pay employment taxes.
Two days before the shooting, a customer overheard defendant angrily telling Coyan "[i]f you think you're going to get away with this, you're dead wrong." Defendant testified that she told a police officer the day before the shooting that she did not want to tip Coyan off that she suspected him of stealing. From these facts, an inference could properly be drawn by the jury that defendant's threatening statement to Coyan referred to Coyan's plan to divulge defendant's alleged tax violations and not, as defendant suggests, to Coyan's alleged stealing.
The day before the shooting, defendant discussed her suspicions about Coyan with police officers from three separate police agencies. Although defendant told the officers that she suspected that Coyan had stolen money immediately preceding her contacting the police, defendant rejected their offers and/or suggestions to immediately confront Coyan. Defendant offered various explanations for her actions. However, the jury was not required to believe defendant and could reasonably have inferred from her actions that defendant planned ahead of time to contact the police so that the officers could later confirm her story that she suspected Coyan of stealing from her.
Finally, defendant testified that she lied to the dispatcher during the first 911 call to make it appear that the robbery was in progress when she shot Coyan, planted the gun in Coyan's hand after she shot him, and then lied to the police about those two crucial facts. Defendant testified that her actions were the result of her fear that the Dublin police would not believe she acted in self-defense because she had had several legal confrontations with Dublin city officials over zoning and property issues. Again, the jury was not required to believe defendant's explanation and could reasonably have inferred that she took those actions to conceal a premeditated crime.
In short, we find that after viewing the evidence presented at trial, including all reasonable inferences that can be drawn therefrom, in a light most favorable to the prosecution, a rational trier of fact could have found that the prosecution proved the element of prior calculation and design beyond a reasonable doubt.
Defendant also contends that the evidence was insufficient to establish the crime of tampering with evidence with regard to the false 911 call. Defendant was charged under R.C. 2921.12(A)(2), which provides:
 (A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
* * *
 (2) Make, present, or use any record, document, or thing, knowing it to be false and with purpose to mislead a public official who is or may be engaged in such proceeding or investigation, or with purpose to corrupt the outcome of any such proceeding or investigation.
Citing the Committee Comment to R.C. 2921.12, which states that the tampering with evidence statute deals with the falsification of "physical" evidence, defendant contends that defendant's 911 call does not constitute a "record, document, or thing" within the meaning of R.C.2921.12(A)(2) because such a 911 call does not involve the creation of false "physical" evidence.
The only case defendant cites in support of her contention is State v. Bailey (1994), 71 Ohio St.3d 443, which held at the syllabus that "[t]he making of unsworn false oral statements to a law enforcement officer with the purpose to hinder the officer's investigation of a crime is punishable conduct within the meaning of R.C. 2921.32(A)(5) [obstructing justice]." Defendant contends that under Bailey, defendant's falsification of the 911 call supports, at most, a misdemeanor charge of obstructing justice under R.C. 2921.32(A)(5). While our research has failed to unearth any cases discussing the precise issue presented in the instant case, we decline to extend Bailey to the facts of his case, as Bailey is distinguishable. Bailey's false oral statement was communicated to the law enforcement officer in person, not via telephone, and no permanent physical record was made of the conversation. In contrast, defendant's false oral statement was communicated to a law enforcement officer via telephone, and a permanent physical record was made of the conversation. Indeed, the tape of the 911 call was played at trial. Accordingly, we find no merit to defendant's contention that defendant's 911 call did not constitute a "record, document, or thing" within the meaning of R.C. 2921.12(A)(2).
We turn now to defendant's manifest weight challenge. Defendant admitted that she shot and killed Coyan. We have previously determined that the state proved the element of prior calculation and design. The only remaining issue in dispute is whether defendant acted in self-defense at the time of the shooting. To establish self-defense, defendant was required to establish, by a preponderance of the evidence, that: (1) she was not at fault in creating the situation giving rise to the affray; (2) she had a bona fide belief that she was in imminent danger of death or great bodily harm and that her only means of escape from such danger was in the use of such force; and (3) she must not have violated any duty to retreat or avoid the danger. State v. Robbins (1979), 58 Ohio St.2d 74, paragraph two of the syllabus.
Defendant's self-defense claim is based solely upon her testimony that Coyan pulled a gun on her when she caught him in the act of stealing, that she believed herself to be in imminent danger of death, and that her only means of escape from such danger was to shoot Coyan. However, defendant also testified that she falsely claimed during the first 911 call that Coyan was in the process of robbing her, that she placed the gun in his hand after she shot him, and that she initially lied to the police because she was afraid she would not be believed because she had had zoning problems with the city of Dublin. Given this evidence, the jury could reasonably have concluded that defendant's testimony about Coyan stealing from her and pulling a gun on her was self-serving and lacked credibility. Considering that the weight to be given the evidence and the credibility of the witnesses are primarily matters for the jury to determine and that it is not the function of the appellate court to substitute its judgment for that of the jury, State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus, this court cannot say that the jury verdict in this case is against the manifest weight of the evidence. Accordingly, a review of the entire record demonstrates that the jury did not lose its way and create a manifest miscarriage of justice by convicting defendant of aggravated murder with a firearm specification. The fifth assignment of error is overruled.
Defendant's sixth assignment of error contends that because her defense counsel failed to object to the prosecution's improper cross-examination questions and closing arguments and failed to request a proper jury instruction on preponderance of the evidence as applicable to her self-defense claim, she was denied effective assistance of counsel in contravention of her rights under the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I, of the Ohio Constitution.
To prevail on an ineffective assistance of counsel claim, a defendant must meet the two-prong test set forth in Strickland v. Washington (1984), 466 U.S. 668. To begin, defendant must demonstrate that counsel's performance was deficient. To meet that requirement, defendant must demonstrate that counsel committed errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment to the United States Constitution. Defendant may prove deficient conduct by identifying acts or omissions that were not the result of reasonable professional judgment. It must then be determined whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690.
If defendant successfully establishes that counsel's assistance was deficient, defendant must then, under the second prong of Strickland, demonstrate that she was prejudiced by counsel's deficient conduct. Id. at 692. To establish prejudice, defendant must demonstrate that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable. Id. at 687. A defendant meets this standard by demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial. Id. at 694.
We have previously determined under the first and second assignments of error that the prosecution did not engage in improper questioning during cross-examination or in improper commentary in closing argument and the trial court did not err in any of its evidentiary rulings. Further, under the fourth assignment of error, we determined that the challenged jury instruction was not improper. Defense counsel's failure to object to proper questioning and/or commentary and proper jury instructions does not constitute deficient performance. Accordingly, defendant has failed to establish the first prong of the Strickland test. The sixth assignment of error is overruled.
By the seventh assignment of error, defendant challenges the sentence imposed by the trial court. Defendant was sentenced on the aggravated murder count to twenty years to life with an additional three years for use of a firearm. On each of the tampering with evidence counts, defendant was sentenced to the maximum term of five years with an additional one year for use of a firearm. The court ordered the tampering counts to be served concurrent to each other, but consecutive to the term for aggravated murder. Defendant contends that the court erred in imposing maximum consecutive prison terms on the tampering with evidence counts.
We note initially that a trial court has broad discretion when sentencing within the statutory limits provided. State v. Haines (Oct. 29, 1998), Franklin App. No. 98AP-195, unreported. A reviewing court may not disturb a sentence imposed by a trial court unless it finds that the sentence is not supported by the record or is contrary to law. Id.
With regard to a trial court's imposition of maximum sentences, R.C.2929.14(C) states in pertinent part that:
 * * * [T]he court imposing a sentence upon an offender for a felony may impose the longest prison term authorized for the offense pursuant to division (A) of this section only upon offenders who committed the worst forms of the offense, [and] upon offenders who pose the greatest likelihood of committing future crimes * * *.
Pursuant to R.C. 2929.14(E)(4), a court may impose consecutive sentences for convictions of multiple offenses if the court finds that consecutive sentences are necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
Further, the court must set forth its reasons for selecting maximum and/or consecutive sentences. R.C. 2929.19(B)(2)(c) and (d).
At the sentencing hearing, the court explained on the record:
 * * * With respect to the tampering charges, the Court has found that the cover-up in this case was obviously intended as a plan between two people who had an opportunity in advance to think about it, to cover-up what has in fact been determined to be aggravated murder. Cover-up, as far as this Court is concerned, is the worst form of obstruction that can exist.
 Maximum and consecutive sentences are appropriate in these circumstances * * *.
 * * * [B]ased upon everything that happened in the trial * * * I saw absolutely no remorse. * * *
 And I find that you are the worst form of offender because of your conduct. You pose the greatest likelihood of committing future crimes. [2/15/01 Tr. 17-18.]
In its sentencing entry, the trial court expressly found that consecutive sentences: were necessary both to protect the public from future crime and to punish defendant; were not disproportionate to the seriousness of defendant's conduct and to the danger the offender poses to the public; and under R.C. 2929.14(E)(4)(b) and (c), respectively, that the harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as a single course of conduct adequately reflects the seriousness of defendant's conduct and that defendant's criminal conduct in this case demonstrates that consecutive sentences are necessary to protect the public from future crimes by defendant.
In addition, the court found:
 The Court, in giving maximum and partially consecutive sentences has determined that the attempted cover-up, consisting of the two counts of Tampering with Evidence, was a plan instituted in concert with the Defendant intended to prevent detection of an aggravated murder. The Court also finds that the Defendant showed absolutely no remorse for killing her minor victim and as such, is the worst form of offender who poses the greatest likelihood, if given the opportunity, to commit a future offense. [2/15/01 Judgment Entry.]
Based on the foregoing, we conclude that the trial court did not err in imposing maximum consecutive sentences on the tampering with evidence charges. The court made the findings required by R.C. 2929.14(C) and (E) and gave its reasons for selecting the sentence. We do not agree with defendant's contention that maximum sentences were not warranted because her conduct in this case was no more serious than conduct normally constituting the offense of tampering with evidence. As noted by the trial court, defendant tampered with evidence to prevent detection of the aggravated murder of a minor victim. In addition, we do not agree with defendant's contention that consecutive sentences were unwarranted because the mandatory prison term of twenty years to life for aggravated murder will "always adequately reflect the seriousness of the offender's conduct." Fear of additional punishment for tampering with evidence after committing a crime provides a strong deterrent for engaging in such conduct.
In addition to imposing a prison term upon defendant, the court imposed court costs of $1,423.88, a fine of $500,000 and restitution of $765,000 in favor of Coyan's estate. Defendant challenges both the fine and the order of restitution.
We first address defendant's contentions regarding the fine. R.C.2929.18(A) provides that a trial court imposing a sentence upon a felony offender "may sentence the offender to any financial sanction or combination of financial sanctions authorized under this section, or, in the circumstances specified in section 2929.25 of the Revised Code, may impose upon the offender a fine in accordance with that section." In addition to a $25,000 fine proscribed by R.C. 2929.02, a trial court may impose a fine of not more than $1 million dollars if the offense for which the offender is being sentenced is aggravated murder. R.C.2929.25(A)(1)(c). Before it imposes a fine, however, the trial court "shall consider the offender's present and future ability to pay the amount of the sanction or fine." R.C. 2929.19(B)(6). There are no express factors that must be considered, nor are there specific findings that must be made. State v. Martin (2000), 140 Ohio App.3d 326, 338.
Citing R.C. 2929.181, defendant contends that the trial court was required to conduct an investigation into defendant's ability to pay the fine. However, pursuant to R.C. 2929.18(E), which replaced R.C.2929.181,[6] a trial court is not required to hold a hearing to comply with R.C. 2929.19(B)(6), although it may do so. "All that is required under R.C. 2929.19(B)(6) is that the court `consider the offender's present and future ability to pay.'" Id.
A review of the record demonstrates that the trial court complied with the above statutory requirements. The court did not impose upon defendant a fine greater than that permitted under R.C. 2929.25(A)(1)(c) for aggravated murder. In addition, the court considered defendant's "ability to pay" the fine. At the sentencing hearing, the court stated:
 * * * I do not want the fine in this case to take away from the family any restitution that might be ordered.
 I do not know how much money you have. I think that will be found out in the short weeks ahead. I am going to ask the prosecutor's office to attach whatever property is appropriate for purposes of holding the property available for the fine and restitution. I am going to ask that that property be put in a fund that I have some control over, not the restitution, but the fine, and if it is determined that there are sufficient funds to pay the fine and restitution and the civil judgment, then I will release the fine for purposes of payment the way the fines are to be paid. * * *
 I will work with the attorneys with respect to how that fine and restitution is to be done so that it is clear what my intent will be * * *. [2/15/01 Tr. 19.]
In its sentencing entry, the court stated:
 The Court has also considered the apparent economic basis for this crime and all of the other factual circumstances surrounding the crime and has determined that a fine is appropriate in addition to the mandatory prison term. The Court further finds that this fine does not exceed the amount which the Defendant will be able to pay and will not impose undue hardship to the offender or her dependents and will not prevent the Defendant from making reparation.
* * *
 The court has considered the Defendant's present and future ability to pay a fine * * *[.]
Turning to the restitution issue, we note that R.C. 2929.18(A)(1) permits a trial court to order a felony offender to pay restitution to the victim of the offender's crime, or any survivor of the victim, in an amount based upon the victim's economic loss. In former R.C. 2929.01(N), applicable at the time of the sentencing, economic loss was defined as "any economic detriment suffered by a victim as a result of criminally injurious conduct and includes any loss of income due to lost time at work because of any injury caused to the victim, and any property loss, medical cost, or funeral expense incurred as a result of the criminally injurious conduct." Criminally injurious conduct is conduct that poses a substantial threat of personal injury or death. R.C. 2929.01(G). Therefore, restitution is a valid statutory sanction to compensate crime victims for crimes that pose the threat of personal injury or death. State v. Ward (1999), 135 Ohio App.3d 76, 81.
However, restitution is limited to the actual loss caused by the offender's criminal conduct for which the offender was convicted. State v. Brumback (1996), 109 Ohio App.3d 65, 82. There must be competent, credible evidence in the record from which the court may ascertain the amount of restitution to a reasonable degree of certainty. Id. at 83. The amount of restitution ordered by the trial court must bear a reasonable relationship to the loss suffered by the victim. State v. Marbury (1995), 104 Ohio App.3d 179, 181. The trial court does not need to conduct a hearing to ascertain the reasonableness of the restitution if there is enough evidence in the record to substantiate the relationship of the offender's criminal conduct with the amount of the victim's loss. Brumback, supra, at 83.
As noted previously, the trial court ordered defendant to pay Coyan's estate $765,000. At the sentencing hearing, the trial court explained its reasoning for its order:
 I am going to take a figure based upon what I perceive the evidence to have been and also life tables connected with the statute, which the Court can take judicial notice of. I am going to make a determination in this case the economic life of the decedent for purposes of earning power would be about 45 years, and use that 45 years, earning power was going to be approximately $8 an hour present value, 2080 hours times $8 an hour, somewhere in the neighborhood of almost $17,000 times 45 years is what I am going to order. That figure will be, if my addition is right, approximately $765,000 * * *. [2/15/01 Tr. 6.]
Defendant contends that economic loss under the criminal restitution statute is limited to losses stemming from property damage. Defendant's contention is clearly misplaced, given the statute's express inclusion of loss of income due to lost time at work, medical costs and funeral expenses.
Similarly, defendant's contention that the trial court erred in awarding restitution based upon Coyan's future earning power is misplaced. As noted previously, economic loss under former R.C.2929.01(N) includes loss of income resulting from lost time at work due to an injury caused to the victim. A victim who is killed as a result of an offender's criminal conduct will foreseeably lose all income from work. Though the definition of economic loss does not specifically include future earning power of the victim, we find it reasonable, under the particular circumstances of the instant case, to include future earning power under the heading of "loss of income."
Further, we find that the trial court engaged in a due process ascertainment of the amount of restitution to be imposed based upon a "reasonable relationship to the loss suffered by the victim." The trial court indicated that it had reviewed the evidence presented at trial. That evidence established that Coyan was only seventeen years old at the time of his death and that he worked full time at the store and earned $300 per week. Coyan's hourly wage could thus be calculated at $7.50 per hour. Although the evidence established that Coyan earned only $7.50 per hour at the time of his death, we find it reasonable, given adjustment for time and inflation, for the court to have calculated his future wage at $8.00 per hour. The trial court further indicated that it had taken judicial notice of "life tables connected with the statute" in calculating Coyan's forty-five year economic life expectancy for purposes of earning power. Based on the foregoing, we find that there was competent credible evidence in the record from which the court could ascertain the actual economic loss suffered by Coyan's survivors due to the loss of Coyan's future earning power. Accordingly, the trial court did not err in ordering defendant to pay restitution of $765,000 to Coyan's estate. The seventh assignment of error is overruled.
For the foregoing reasons, all seven assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
BRYANT, J., and TYACK, P.J., concur.
[1] Defendant objected after the first quoted passage from the prosecution's rebuttal argument. However, it is not clear whether defendant was objecting to the comment about defendant planting the money and the body or to the comment about Schlotterer's failure to testify.
[2] Evid.R. 611(A) provides: "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."
[3] Crim.R. 30(A) provides in part: "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."
[4] Crim.R. 52(B) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."
[5] Crim.R. 52(A) provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."
[6] In State v. Northam (Sept. 30, 1999), Franklin App. No. 98AP-1592, unreported, this court stated: "R.C. 2929.181, which would have required courts to hold a hearing in order to determine an offender's ability to pay a fine, was initially enacted by S.B. No. 2 and was set to take effect on July 1, 1996. However, Am.Sub.S.B. No. 269, which was subsequently enacted on June 28, 1996, repealed R.C. 2929.181
effective July 1, 1996 and R.C. 2929.181 "never became governing law within the state of Ohio." [Id., citing State v. Frede (Nov. 24, 1997), Clermont App. No. CA97-02-011, unreported.]